## D'HONDT *v.* SLOVEKOWSKI.

1. APPEAL AND ERROR—MOTION FOR JUDGMENT NON OBSTANTE VER-
EDICTO—EVIDENCE.

In reviewing trial court's refusal to grant defendant's motion
for judgment *non obstante veredicto* in action for damages
for false imprisonment, the testimony must be construed in
the light most favorable to plaintiff.

2. FALSE IMPRISONMENT—PARALYTIC STROKE—POLICE OFFICERS.

In action for false imprisonment against members of city po-
lice department, verdict should have been directed for the two
officers who had been sent on the call to rescue plaintiff who
had collapsed from a paralytic stroke while en route home from
work in the afternoon in the middle of December where their
action resulted in placing him in the police station in charge
of their superior officer, police regulations forbidding their
taking him to his home outside of the city.

3. SAME—PARALYTIC STROKE—POLICE LIEUTENANTS—EVIDENCE.

In action for false imprisonment by plaintiff who had suffered
a paralytic stroke while en route home in the middle of De-
cember where testimony is in conflict as to whether defendant
lieutenant, in charge of police station when plaintiff was
brought in, was told plaintiff was suffering from paralytic
stroke before defendant ordered that he be locked up in bull
pen and whether plaintiff had fallen from bench therein to the
floor and received injury, refusal to direct verdict or enter
judgment *non obstante veredicto* for such defendant was not
error.

4. SAME—POLICE LIEUTENANTS—EVIDENCE.

In action by victim of paralytic stroke against members of city
police department for false imprisonment, where evidence
fails to show the commission of any overt act harmful to
plaintiff or failure to perform any official duty, which failure
was detrimental to plaintiff, by lieutenants in charge of police
station on shifts following that on which he was brought to
station, they were not liable as a matter of law.

Doctrine of *res judicata* applied to judgment notwithstanding ver-
dict, see Restatement, Judgments, § 52, comment c.

5. SAME—DAMAGES—DELAY IN TREATMENT OF VICTIM OF PARALYTIC
STROKE—NEW TRIAL.

> In action for false imprisonment by plaintiff who had suffered
> a paralytic stroke before being taken into custody by defend-
> ant police officers, where plaintiff's testimony shows that
> defendants' action may have merely delayed treatment so as
> to aggravate condition, verdict and judgment for $2,000 was
> so excessive as to make denial of new trial reversible error.

Appeal from Wayne; Moynihan (Joseph A.), J.
Submitted January 19, 1943. (Docket No. 72, Cal-
endar No. 41,844.) Decided June 30, 1943.

Case by Rene D'Hondt against Walter Slove-
kowski, John Ratowski, William Perski, Edward
Stark, Walter Kraft and others for damages caused
by false imprisonment. From verdict and judg-
ment for plaintiff against named defendants, they
appeal. Reversed with new trial as to defendant
Perski. Reversed without new trial as to other
defendants.

*Berger, Manason & Kayes* and *Albert A. Williams,*
for plaintiff.

*Stanley J. Draganski* and *Con S. Gryczka,* for
defendants and appellants.

NORTH, J. This suit was brought by plaintiff
against eight members of the police department of
the city of Hamtramck, Michigan; and by it plain-
tiff seeks to recover damages primarily on the
ground of false imprisonment, although the decla-
ration alleges assault and battery and unlawful
arrest. On trial by jury plaintiff had verdict
against the five defendants named herein as appel-
lants in the sum of $2,000. The verdict of the jury
was in favor of the three other defendants and they

are not parties to this appeal. From the judgment entered on the verdict the five defendants named herein have appealed.

At the close of plaintiff's proofs and at the close of all the proofs a motion for a directed verdict in favor of "each and all of" the defendants was made. These motions were taken under advisement and defendants' subsequent motion for judgment *non obstante veredicto* was denied. Among the reasons assigned in support of the latter motion were the following: that there was insufficient testimony to support the verdict and judgment; that plaintiff failed to prove a cause of action, and that the verdict was contrary to the facts disclosed. In reviewing the court's refusal to grant defendants' motion the testimony must be construed in the light most favorable to plaintiff; and, omitting minor and unimportant details, the facts may be stated as follows.

On December 15, 1938, plaintiff, about 53 years of age, was an employee of the Dodge auto factory in Hamtramck. At the conclusion of his day's work about 3:30 in the afternoon he left the factory and at that time he experienced a burning sensation on the left side of his face, his tongue became somewhat numb and he felt the cords in the back of his knee "tighten up." He went across the street from the factory and sat down in a place of business for approximately an hour, and then he decided he would attempt to walk about a block to the point where he would board a street car on his way home. After walking about 80 feet from the place where he had rested he fell in the street. He testified that he had not drunk any intoxicating liquor, and from the record there can be no reasonable doubt that plaintiff sustained a paralytic stroke. Some third party lifted him into a sitting position on a milk box

or crate. Plaintiff testified that he was taken into a restaurant. However, the police officers who picked him up testified that he was still sitting on the box and leaning against the light standard at the time they appeared on the scene.

By means of a call through a police signal box defendants Slovekowski and Ratowski were notified to go to the place where plaintiff had fallen. He testified that when the police officers appeared he informed them he had had a stroke and wanted to go home. With the help of bystanders defendant was placed in the rear part of the two-door scout car which the officers were driving. The officers testified he was placed on the back seat of the car, but plaintiff testified he was placed on the floor between the front and rear seats. He also testified, ''I don't think they put me on the seat.'' On the way to the police station, a distance of only four or five blocks and which the testimony shows was covered in a matter of two or three minutes, plaintiff again informed the officers that he had had a stroke and wanted to go home. His home was outside the city limits of Hamtramck and the undisputed record is that officers on duty were not allowed to go outside of the city limits, except on special orders. There is a conflict of testimony as to whether the officers explained to plaintiff that for the above reason they could not take him home. There is also conflict as to whether the officers offered to take plaintiff to the city hospital and he refused to be taken there, still insisting he wanted to go home and again informing the two policemen, as plaintiff testified, that his condition was caused by a paralytic stroke.

Upon arrival at the police office two officers, one on either side of plaintiff, supported him and aided him in getting into the general·reception room of

the police station. The officers testified they placed him on a seat near the entrance but plaintiff testified, ''I think I was sitting on the floor.'' Thereupon the officers who had taken plaintiff in charge reported to their superior, Lieutenant William Perski, in charge at that time. In this particular the testimony of one of these officers is as follows:

''I don't remember how many people were in the station that day when I came in, there was quite a few. As soon as I came in and put him (plaintiff) on the bench, the officer behind the desk told me we had another call. I just explained about the gentleman (plaintiff) and he (lieutenant) gave us a call and (we) went away, told him I had picked up the man at the corner of Clay and Joseph Campau and the man claimed he had a stroke, and then I left (in about a minute) on another call and never saw the man (plaintiff) after that.''

The foregoing is a sufficient statement of the factual aspect of this case upon which to base a decision as to defendants Slovekowski and Ratowski. In our opinion the record is not such as would justify a verdict against either of these two defendants. In the regular discharge of their duties they were called to the place where plaintiff had fallen upon the street and found him in a helpless condition. Plaintiff's own safety, welfare and protection, as a member of the public, made it emphatically just and proper, if not imperative, that defendants Slovekowski and Ratowski should take plaintiff into custody, regardless of whether his helpless condition was due to intoxication (as they might well have inferred) or to a physical affliction. In either event the officers would have been derelict in their duty if they had abandoned plaintiff to the hazards of the December cold and unprotected in a public place while in his helpless condition. Police regu-

lations prohibited these two officers from taking plaintiff to his home outside of Hamtramck city limits. There is no claim that plaintiff asked to be taken to the Hamtramck city hospital, and indeed he denies the testimony of the two officers that they offered to take him there and that he refused to go. Obviously, the only alternative these two officers had was to take plaintiff the short distance of four or five blocks where he would have the protection and the assistance which the police department afforded him and entrust plaintiff to the care of the superior officer in charge. Under such circumstances it must be held that plaintiff did not make out a case against either of these two officers. The motions for a directed verdict in their behalf and finally for judgment *non obstante veredicto* should have been granted. As to defendants Slovekowski and Ratowski the judgment in the trial court is reversed without a new trial, with costs of both courts to these two appellants.

The remaining appellants are Lieutenants William Perski, Edward Stark and Walter Kraft. In passing upon their contention that the motions for directed verdict and for judgment *non obstante veredicto* should have been granted, further reference to the record is necessary; and here again the testimony must be considered in the light most favorable to plaintiff. These three lieutenants were the officers in charge of the police station, each having a separate shift of eight hours. Perski was on duty from 3 p. m. to 11 p. m., Stark from 11 p. m. to 7 a. m., and Kraft from 7 a. m. to 3 p. m. From the testimony hereinbefore quoted, as well as other testimony, it appears that the officers who brought plaintiff to the police station at once advised Perski that plaintiff "claimed he had a stroke." There is ample testimony to show that plaintiff at that time was para-

lyzed in his left leg and left hand or arm, and that he was unable to talk distinctly. About 20 minutes after plaintiff was brought to the police station Perski went from his desk over to the bench where plaintiff was seated, obviously for the purpose of ascertaining who he was and what was his condition. Plaintiff testified that when he heard the officers at the station say he was drunk he told them, "I didn't have a drink, I said I was paralyzed." Plaintiff gave his name and place of residence to Perski and the latter, through another police station, attempted to get word to plaintiff's family, evidently in order that they might come and take him home. The officers were unable to find any one at plaintiff's home. Perski testified he got fairly close to plaintiff when interviewing him and "I was able to detect a faint smell of alcohol, just a faint smell," and further that plaintiff caused more or less of a disturbance, particularly by asserting that he wanted to go home. Perski ordered that plaintiff be placed in the part of the jail where lodgers or safekeepers are locked, the so-called "bull pen." The officers laid plaintiff upon a wooden bench along the side wall of the detention room, which bench plaintiff said was 12 or 14 inches wide, but officers testified it was approximately three feet wide and sloped somewhat back toward the wall. Plaintiff testified that in about 20 minutes he fell from this bench onto the cement floor and remained there until approximately 6:30 the following morning. Evidently in falling from the bench plaintiff suffered something of a cut over his left eye. Perski testified that shortly before the end of his shift at 11 p. m. he looked into the "bull pen" and plaintiff was asleep on the bench. He also testified that another officer had made an observation in the detention room and reported plaintiff asleep on the

bench. In keeping the police record the names of persons who are arrested and charged with some offense are kept on the upper portion of the blotter or register; and the names of those who are merely lodgers or "safekeepers" are noted on the lower portion of the page. Perski placed plaintiff's name on the lower portion of the page with the notation that he was to be released in the "p. m." which evidently meant that he should be released whenever in condition to go; and Perski testified it was his intention that plaintiff should be detained only until such time as he was in a condition to be released with reasonable safety. It is a fair inference from the record that Perski thought plaintiff was intoxicated.

At 11 p. m. defendant Edward Stark took charge of the police station. About 6:40 in the morning, when occupants of the "bull pen" were to be released, it was discovered that plaintiff was lying on the cement floor; that he had sustained something of a cut over his left eye and it was not possible to arouse him from his sleep or unconscious condition. Thereupon plaintiff in an unconscious condition was carried into the patrol wagon and taken to the hospital. Stark testified that he was not on duty at the time plaintiff's condition was reported. Concerning this he testified: "It was during my shift but I wasn't in the station at the time. I might have been out checking on a call or some other duty. * * * I don't know where I was. I wasn't present at the station. I was the officer in charge of the station during that shift." Sergeant John Lucas who served at the desk with Lieutenant Stark testified that the man in charge of the detention quarters for sleepers and "safe keepers" called his attention to plaintiff's condition and that plaintiff was thereupon sent to the hospital "on my orders."

Plaintiff was left at the hospital without any communication as to his claim that he had suffered a stroke. The physician in charge treated the cut over plaintiff's eye and upon call from the hospital the police about 7:30 a. m. returned plaintiff to the general detention room or "bull pen" at the police station. Seemingly the doctor at the hospital did not ascertain that plaintiff had suffered a paralytic stroke. At the time plaintiff was returned from the hospital to the jail Lieutenant Kraft was in charge at the station. About 9 o'clock in the forenoon of the 16th, Chief of Police Berg came to the station and upon being advised by Sergeant Wroblewski of plaintiff's condition, that he "looked pretty bad and something isn't quite right," the chief talked to plaintiff who at that time was sitting on a bench at the police station. Plaintiff remained at the police station until about 1 o'clock that afternoon when he was again taken to the city hospital, where he remained for 29 days; and thereafter was at Eloise as a hospital patient for three months. Plaintiff testified that he was unconscious and had no knowledge of what transpired from the time he fell off the bench after entering the police station until sometime later when he was in a bed at the hospital.

We have thought it necessary to state the foregoing facts quite in detail as bearing upon decision of the appeal by defendants Perski, Stark and Kraft. As to defendant Perski, there is conflict in the testimony relative to his having been told that plaintiff was suffering from a paralytic stroke before plaintiff was locked up in the bull pen on Perski's order; and also as to whether plaintiff had fallen off the bench on which he had been placed and was lying on the cement floor, and had received the cut over his eye from such fall before Perski, as he testified, looked into the bull pen during the evening and saw plaintiff. Further, from all the testimony there is

room for a difference of opinion, and therefore an issue of fact, as to whether Perski was guilty of any neglect of duty owing to plaintiff which resulted in damage to the latter. The trial court was not in error in refusing to direct a verdict or enter judgment *non obstante veredicto* in favor of Perski.

The record is different as to defendants Stark and Kraft. The former came on duty at the desk in the police station at 11 p. m., and the latter at 7 the following morning. It is a fair inference from the record that a subordinate officer had the immediate supervision or charge of the bull pen for the periods during which Stark and Kraft were on duty. Neither of them was informed that plaintiff was suffering from a paralytic stroke or of anything concerning plaintiff's condition that was out of the ordinary prior to the time he was removed to the hospital, nor did anything occur thereafter in consequence of which either of these two defendants could be charged with a breach of duty. Since plaintiff did not produce testimony tending to show that either Stark or Kraft had committed any overt act which was harmful to plaintiff or had failed to perform any official duty which failure was detrimental to plaintiff, the motions for directed verdict and for judgment *non obstante veredicto* in behalf of Stark and Kraft should have been granted.

Among the reasons assigned by appellants in support of their motion for a new trial is that the verdict and judgment in the amount of $2,000 was greatly in excess of any damages proven. Without comment on this contention, the trial judge denied the motion for a new trial. It should have been granted.

The theory upon which plaintiff relies and his own testimony is to the effect that he had suffered the paralytic stroke before the police were sum-

moned. His condition when they first saw him was as bad or worse than at the time of trial. Plaintiff's personal physician was the only expert witness. The gist of his testimony as plaintiff's witness was only that by being taken into custody and being detained by the police plaintiff might have been excited and treatment delayed, and thereby plaintiff's condition might have been aggravated. Concerning plaintiff this doctor testified:

"His present condition was caused by a cerebral hemorrhage. * * * I can't say, as a matter of fact, as a matter of positive testimony, that this man's condition could have been any better or any worse if he had been taken directly home. No one can tell you that. * * *

"*Q.* But you can you say whether or not greater hemorrhage was created [by plaintiff's having been taken to and confined at the police station]?

"*A.* No, no, I wasn't there. * * * The immediate treatment is the essential thing * * * this paralysis that he discloses is one of the common results of a stroke, * * * and when the paralysis like he has on the left side, once that paralysis comes on, the damage is done. The minute the paralysis sets in so he can't use his leg or arm, the damage is done."

Notwithstanding other incidental elements of possible damage as to which there was some testimony, our review of this record satisfies us that the verdict and judgment were excessive. As to defendant Perski, the judgment is reversed and a new trial ordered; but as to defendants Slovekowski, Ratowski, Stark and Kraft, the judgment is reversed without a new trial. Costs to defendants.

BOYLES, C. J., and CHANDLER, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.